UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JENNIFER RICHARDSON,
o/b/o Frank Richardson

                                   Plaintiff,

      v.                                                6:05-CV-0078
                                                                  (LEK/GJD)
COMMISSIONER OF SOCIAL
 SECURITY,

                                   Defendant.

_____

LAWRENCE D. HASSELER, ESQ., Attorney for Plaintiff
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, United States Magistrate Judge

**REPORT-RECOMMENDATION**

On behalf of Frank Richardson (F.R.), Jennifer Richardson (Plaintiff) commenced this action pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security, denying F.R.'s application for supplemental security income (SSI).

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI benefits on September 30, 2003 alleging that her son, F.R. became disabled on April 1, 1998. (Administrative Transcript ("Tr") at 47-50). The application was initially denied on December 3, 2003. (Tr. 40-42). A hearing before an Administrative Law Judge ("ALJ") was requested and, on August 6, 2004, plaintiff testified before the ALJ. (Tr. 442-62). The ALJ issued a decision denying benefits on September 2, 2004. (Tr. 28-33). The ALJ's decision

became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on January 10, 2005. (Tr. 3-6).

## CONTENTIONS

Plaintiff raises the following contentions:

1. The ALJ erroneously determined that F.R. did not suffer from a listed impairment. Brief at 9-14.

2. The ALJ erroneously concluded that F.R.'s impairment was not functionally equivalent to a listed impairment. Brief at 14-20.

Plaintiff requests reversal of the administrative decision and calculation of benefits. Plaintiff's Brief at 21. Defendant argues that the Commissioner's decision is supported by substantial evidence, and the complaint should be dismissed.

## FACTS

**1.    Non-Medical Facts**

F.R. was born on September 7, 1990 and, lives with his father, mother, and two sisters. (Tr. 444). F.R. lived in upstate New York until the age of five, and then lived in North Carolina for three extended time periods before returning to New York in the Summer of 2002. (Tr. 429).

F.R. has had academic difficulties. F.R. has been held back from three different grade levels and, in November 2002, was three years older than his classmates. (Tr. 134, 433). The record contains voluminous reports from several school districts. The reports contain F.R.'s referrals to Special Education classes; I.Q. test results; comments about various Individualized Educational Plans (IEPs); comments from teachers; and reports from school psychologists and other specialists

2

in the school systems. (Tr. 114-23, 131-82, 205-298).

Many of F.R.'s teachers have commented about F.R.'s academic difficulties. In December 2001, teacher Rebecca Randall wrote that eleven year old F.R. did not know how to subtract, wrote at a 2nd grade level, and was "failing everything" she was teaching him. (Tr. 133). Ms. Randall also noted that F.R. attended speech therapy, remedial reading, and needed special math and writing practice. (Tr. 133). In November 2003, a special education teacher wrote that F.R. was "unable to function in the mainstream [class setting] due to his limited academic ability." (Tr. 383).

While most school records clearly show substantial academic and personality deficits, some reports show that F.R. functioned at higher academic levels when motivated (Tr. 239) or when he followed directions (Tr. 283). Other reports show that at times, F.R. was friendly, honest, respectful, and had "math" ability. (Tr. 258, 337, 350, 392). Several reports show that F.R.'s behavior was suggestive of Attention Deficit Hyperactivity Disorder (ADHD) (Tr. 304) or had strong evidence of ADHD (Tr. 308, 420, 431). The reports also stated that medication may help F.R. (Tr. 420). The report by psychologist Donald Danser in November of 2003 states that F.R. started taking the medication, Strattera, three months prior and it had "***helped improve his concentration and reduce his impulsivity***." (Tr. 430)(emphasis added).

End-of-grade tests also show F.R.'s academic difficulties. In the Spring of 2001, tests in North Carolina show very low reading proficiency. (Tr. 108). Similar tests in the Spring of 2002, show very low levels of proficiency in reading and

3

mathematics. (Tr. 136).  At the August 2004 hearing, plaintiff stated F.R. had classes with a 8:1:1 student to teacher ratio, would not receive a regular diploma, and was on an IEP.  (Tr. 452, 453).

F.R. has also had behavioral difficulties.  Plaintiff testified that F.R. lost his temper once a day and fought with his two sisters, toddler nieces and nephew, and adults. (Tr. 445-48).  In March 2000, F.R.'s teacher reported that F.R. hit another student and had "his hands around [the other student's] neck." (Tr. 312).  Plaintiff testified that F.R. had injured a student, requiring that the student receive stitches. (Tr. 454).

After F.R. injured the other child, F.R. was classified as a Person in Need of Supervision (PINS). (Tr. 460).  F.R. was placed on probation and, at the August 2004 hearing, plaintiff testified that F.R. met with a probation officer three or four times a week during the school year. (Tr. 455-56).  Plaintiff testified that F.R.'s probation had been extended after a September 2003 incident where F.R. threatened to "punch a hole in [a bus driver's] face."  (Tr. 447).

**2.      Medical Facts**

F.R. claims SSI disability based upon a learning disability (LD) and attention deficit/hyperactivity disorder (ADHD).[1]  (Tr. 53).  The medical evidence includes treating physician and psychologist records, an examining psychologist opinion, and

---

[1]The essential feature of Attention deficit / Hyperactivity disorder is a "persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 85 (4th Ed., text revision 2000). *See Generally, Id. at* 85-93.

a non-examining expert assessment.

### 1. Treating Physicians and Medications

In April 1999, Wayne Cox, M.D. determined that F.R. should be evaluated for ADHD. (Tr. 417). Dr. Cox stated he would prescribe Ritalin if necessary, and referred F.R. to a specialist. (Tr. 417). The specialist evaluated F.R. and prescribed ADHD medication that F.R. took for only one month before plaintiff stopped giving him the medication. (Tr. 430). The record states that F.R.'s mother stopped giving him the medication because she did not believe in it. (Tr. 430). The court notes, however, that F.R. was taking medication at the time of the ALJ's hearing. (T. 456). In August 2003, the North Country Children's Clinic prescribed Strattera, after diagnosing F.R. with ADHD and possible Oppositional Defiant Disorder (ODD).[2] (Tr. 423).

### 2. Psychological Evaluation Results

F.R. has been evaluated by three psychologists - one in 1998, one in 2001, and one in 2002 (Tr. 419, 432). In May 1998, Kimberly S. Taylor, M.A., C.A.S., a School Psychologist, administered the Wechsler Intelligence Scale for Children- 3rd Edition (Wechsler III). (Tr. 408). The test results indicated that F.R. had a Verbal IQ of 91, a Performance IQ of 70, and a Full Scale Ability score of 78. (Tr. 408). School Psychologist Taylor noted that there was a "significant discrepancy" between the

---

[2]The essential feature of Oppositional Defiant Disorder (ODD) is a "recurrent pattern of negitivistic, defiant, disobedient, and hostile behavior toward authority figures that persists for atleast 6 months and is characterized frequent loss of temper, arguing with adults, deliberately annoying other people, blaming others for misbehavior or mistakes, being easily annoyed by others, being angry and resentful, or being spiteful or vindictive. *Id. at* 100-102.

Verbal and Performance IQ and suggested the Full Scale Ability score be viewed with caution. (Tr. 408). School Psychologist Taylor also performed a Bender Gestalt Visual Motor Test on F.R., determining F.R. to have a "deficient range" score that was commensurate with F.R.'s Performance IQ. (Tr. 408).

In November of 2002, F.R. was tested and evaluated by School Psychologist Shirley McFadden. F.R.'s verbal I.Q. was 85, his Performance I.Q. was 77, and his Full Scale I.Q. was 79. (Tr. 432). Ms. McFadden concluded that F.R. Was within the low average and borderline ranges of cognitive ability. (Tr. 432-33). She recommended that F.R. be placed in a special education program, be given an occupational therapy consultation, and that his behavior be monitored to see if medication for his ADHD should be recommended. (Tr. 433).

In May 2001, David Novak, Ph.D. administered another Wechsler III test and a Woodcock-Johnson Psycho-Educational Battery-Revised, Test of Achievement (Woodcock-Johnson). (Tr. 418-20). The Wechsler III test showed that F.R. had a Verbal IQ of 85, a Performance IQ of 77, and a Full Scale IQ of 79. (Tr. 419). Dr. Novak believed that the Wechsler III test indicated F.R. was in the borderline or slow learner range, and thought the difference between the Verbal and Performance IQ scores was not significant. (Tr. 419).

The Woodcock-Johnson test evaluates academic achievement levels in reading, mathematics, and written language. (Tr. 419). Dr. Novak noted F.R. had difficulty with basic math, did not know his multiplication tables, had very weak irregular plural usage and spelling, wrote fragmented sentences, and had very poor

6

penmanship. (Tr. 419-20). Dr. Novak diagnosed F.R. with borderline intellectual functioning, significant behavior problems suggestive of ADHD, and achievement test scores not significantly below expectation based on intellectual ability. (Tr. 420).

### 3.     Consultative Psychologist

Donald B. Danser, Ph.D. performed a psychiatric consultative examination of F.R. on November 17, 2003. (Tr. 429-33). Dr. Danser reported F.R., then thirteen years old, did not know how many weeks or months were in a year, or in what direction the sun rises. (Tr. 430). Dr. Danser diagnosed ADHD, possibly ODD, and a reading disorder. (Tr. 431). Dr. Danser believed that F.R. needed multiple services; including, special education, psychiatric review, individual therapy, and case management. (Tr. 431).

### 4.     Non-Examining Psychiatrist

After reviewing F.R.'s records, Karen Prowda, M.D., a board-certified psychiatrist, completed a Childhood Disability Evaluation Form on December 8, 2003. (Tr. 434-39). Dr. Prowda determined plaintiff's impairments to include borderline intelligence; ADHD, by history; and a reading disorder by history. (Tr. 434). Dr. Prowda found that although these impairments were severe, they did not meet, medically equal, or functionally equal a listed impairment. (Tr. 434). Dr. Prowda evaluated the records and also found that F.R. had less than marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks; less than marked limitations in interacting and relating with others, and less than marked limitations in health and physical well-

being. (Tr. 437). Dr. Prowda found no limitations in the domains of "moving and manipulating objects" and "caring for yourself." (Tr. 437).

## DISCUSSION

**1.   Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

2.  **Standard for Children's SSI Benefits**

Congress amended the definition of childhood disability in 1996. *See* PRWORA,[3] Pub. L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42 U.S.C. § 1382c). Prior to 1996, a child was entitled to SSI disability benefits if he or she suffered from a "medically determinable physical or mental impairment of comparable severity" to that which would disable an adult. *See* 42 U.S.C. § 1382c(a)(3)(A) (1994).

The PRWORA replaced this "comparable severity" standard with one that focuses on whether a child has "marked and severe" limitations. 42 U.S.C. § 1382c (2003). This standard involves a three-step analysis. 20 C.F.R. § 416.924(a) (2003). The first question is whether the child is engaged in substantial gainful activity. 20

---

[3] Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42 U.S.C. § 1382c).

C.F.R. § 416.924(b) (2003). If not, then the second inquiry is whether the child has a severe impairment. *Id.* at § 416.924(c) (2003). A "severe" impairment is one that is more than a "slight abnormality." *Id.* If the child's impairment is severe, then the third question is whether the impairment meets or is medically or functionally equal in severity to a disability listed in the Listing of Impairments. *See* 20 C.F.R. § 416.924(c) (2003)(citing 20 C.F.R. Part 404, Subpt. P, App. 1 ("the Listings")). If all three of the above requirements are met, and the child's disability has met the twelve month durational requirement,[4] then the child will be considered disabled for purposes of SSI disability benefits. 20 C.F.R. § 416.924(d) (2003).

An impairment "meets" the severity of a listed impairment if the "medical findings are at least equal in severity and duration to the listed findings." 20 C.F.R. § 416.926(a) (2003). If the impairment is not listed or medically equivalent to a listed impairment, then "functional equivalence" must be examined. An impairment is "functionally equivalent" if the impairment(s) are of listing-level severity. 20 C.F.R. § 416.926a (a) (2003). An impairment meets listing-level severity if the impairment results in "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ." *Id.* The six domains considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) the child's ability to care for him/herself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(g)-(l) (2003).

---

[4] 20 C.F.R. §§ 416.909, 416.924(d)(1) (2003).

The regulations state that a child has a "marked" limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i) (2003). A "marked" limitation is also described by the regulations as more than moderate but less than extreme and is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.*

A finding of an "extreme" limitation is warranted when the child's impairment(s) interferes *very* seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i) (2003). An "extreme" limitation is also described by the regulations as "more than marked" and the rating "given to the worst limitations." *Id.* The court does note that although a rating of "extreme" may be given, it does not necessarily mean a total lack or loss of ability to function. 20 C.F.R. § 416.926a(e)(3)(i). The "extreme" rating is the equivalent of the functioning expected on standardized testing with scores that are at least three standard deviations below the mean. *Id.*

### 3.  The ALJ's Decision

In this case, at the first step of the analysis, the ALJ found that plaintiff was not engaged in substantial gainful activity, and thus, proceeded to step two. (Tr. 29). At the second step of the evaluation, the ALJ found that F.R. did have "severe" impairments, consisting of borderline intellectual functioning; a learning disorder; and ADHD. (Tr. 29). The ALJ also found that F.R. had the "severe" physical

11

impairments of asthma and allergic rhinitis. (Tr. 29).

Although the ALJ found that F.R. had severe impairments, the ALJ found at step three of the analysis, that these severe impairments did not meet or equal the severity of a Listed Impairment, nor were F.R.'s impairments medically or functionally equivalent to a Listed Impairment. (Tr. 30-31). First, the ALJ examined plaintiff's borderline intellectual functioning and learning disability under the specific Listings 112.02 (Organic Mental Disorders) and 112.05 (Mental Retardation). (Tr. 29-30). *See* 20 C.F.R. Part 404, Subpt. P, App. 1, Pt. B, §§ 112.02, 112.05.

Without citing any specific section of the particular listings that he was evaluating, the ALJ found that F.R.'s I.Q. scores were well above those required to meet a listing for mental retardation. The ALJ also stated that F.R.'s ADHD did not show sufficient incidences of aggressive behavior and treatment records showed that F.R.'s attention had improved with the prescription of Strattera. (Tr. 29-30). The ALJ also found that F.R.'s impairments were not functionally equivalent to a Listed Impairment because F.R. did not have any extreme or marked limitations of functioning in *any* of the six applicable domains, listed in the regulations. (Tr. 30-31). The ALJ concluded that F.R. was not disabled for purposes of SSI. This court must now determine whether the ALJ's decision is supported by substantial evidence.

**4.    Listed Impairment**

Plaintiff argues that F.R. meets the criteria for a listed impairment under Listing § 112.05(A); Listing § 112.05(D); and Listing § 112.05(E). Section 112.05 is

12

entitled "Mental Retardation" and requires, first, that the impairment be characterized by "significantly subaverage general intellectual functioning with deficits in adaptive functioning." Listing § 112.05. Sections D and E of 112.05 require that the child have a valid verbal, performance, or full scale IQ of 60-70. Sub-section D then requires a physical or other mental impairment that imposes an additional and significant limitation of function. Sub-section E requires the IQ of 60-70 together with limitations listed in one of the paragraphs of section 112.02(B)(2)(b), (B)(2)(c), or (B)(2)(d).

Plaintiff argues that one of the IQ tests taken by F.R. showed a performance IQ of *70*, thus, allowing F.R. to meet the first requirement of these two sub-sections. The test to which plaintiff refers was administered in 1998 and resulted in a verbal IQ score of 91; a performance IQ score of 70; and a full scale IQ score of 78. (Tr. 408). The court first notes that School Psychologist Kimberly Taylor, who administered this test commented that because of the significant difference between the verbal score and the performance (non-verbal) score, "his full scale score should be viewed with caution", and the school-based committee "may wish to utilize his Verbal IQ score when determining discrepancies." (Tr. 408). This statement implies that School Psychologist Taylor believed that F.R.'s abilities were greater than the results of performance IQ would indicate.

A test administered in 2001 resulted in a verbal IQ score of 85; a performance IQ score of 77; and a full scale IQ of 79. (Tr. 419). A November 2002 test, administered by School Psychologist Shirley McFadden resulted in very similar

13

scores to the 2001 test: a verbal IQ score of 85; a performance IQ score of 77; and a full scale IQ score of 79. (Tr. 432). In his May 1, 2001 report, Psychologist David Novak stated that the difference between F.R.'s verbal and performance IQ was no longer significant, and that F.R. may have matured in his non-verbal cognitive skill areas. (Tr. 419). In her November 7, 2002 report, School Psychologist McFadden stated that F.R. had been placed in special education based upon the 1998 test, but had been "declassified" after the 2001 re-evaluation and the lack of discrepancy between the verbal and non-verbal scores. (Tr. 432). F.R. was referred to special education again in 2002 because of the trouble he was having with Fourth Grade work. (Tr. 432).

Plaintiff argues that according to the Listings, IQ scores at F.R.'s age were valid for only two years, and even though the 2001 scores were higher than the 1998 scores, the 2001 scores were no longer valid when the ALJ issued his September 2004 decision, which would require ALJ to acknowledge that plaintiff suffered from a Listed Impairment for two years following the 1998 evaluation or was required to reconcile the differing scores by obtaining an updated evaluation. This court cannot agree with plaintiff's argument. First, as defendant points out, even if plaintiff is alleging disability for F.R. as of 1998, plaintiff did not apply for SSI until 2003, and F.R. would not be eligible to receive benefits until the month after the application. 20 C.F. R. § 416.335. Thus, it is the more recent tests that would be determinative of F.R.'s condition.

In any event, plaintiff never mentions the 2002 evaluation that was consistent

with the 2001 evaluation, both finding that F.R.'s IQ scores were well above the Listing requirement. The ALJ's reliance upon these later records in finding that F.R. did not meet the IQ requirement of Sections 112.05(D) or (E) is supported by substantial evidence. Since F.R. did not meet the IQ requirement of sections (D) or (E), the court need not determine whether the other requirements were met.

Section 112.05(A) does not require a specific IQ score. However, this section may not even be applicable to F.R. The introductory section of 112.00 states that standardized intelligence test results are essential to the adjudication of all cases of mental retardation that are not covered by sections 112.05(A); 112.05(B); and 112.05(F). *See* App. 1, § 112.00(11). This introductory section then states that sections 112.05(A), (B), and (F) "may be the bases for adjudicating cases where the results of standardized intelligence tests are unavailable ... ." *Id.* In this case, F.R. has three standardized IQ tests in the record, thus, section 112.05(A) is not applicable. Therefore, the ALJ's finding that F.R.'s impairments do not meet or equal a Listed Impairment is supported by substantial evidence.[5]

**5.     Functional Equivalence**

As stated above, a determination of functional equivalence involves determining the effects of a child's impairments on six different "domains." 20 C.F.R. § 416.926a (a) (2003). The child must have marked limitations in two of the domains or an extreme limitation in one of the domains. *Id.* The ALJ in this case found that

---

[5] Plaintiff does not argue that he meets Listing 112.02 separately from section 112.05(A) which refers to certain subsections of 112.02.

the record did not demonstrate any "extreme" limitations of functioning, nor did the record demonstrate "more than one area of marked limitation in the applicable domains ... ." (Tr. 32). Plaintiff argues that the ALJ's determination is not supported by substantial evidence and that the record shows at least "marked" limitations in the domains of acquiring and using information; attending and completing tasks; and interacting and relating with others. Brief at 13-20.

Plaintiff argues F.R. has severe problems in all the relevant areas considered in the domain of acquiring and using information. Plaintiff cites to the regulations for examples of what "marked" limitations in these relevant areas would be. Plaintiff states that an example of a "marked" limitation is listed as having "difficulty recalling important things [the child] learned in school yesterday." *See* 20 C.F.R. § 416.926a (g)(3)(iii). However, this section also states that the examples describe "some" limitations that can be considered in the domain, but "the examples do not necessarily describe a 'marked' or 'extreme' limitation." *Id.* Thus, plaintiff is incorrect in stating that these examples are of "marked" restrictions.

The court also notes that the, non-examining, consulting psychiatrist evaluated F.R.'s school records and found that these limitations were "less than marked." In particular, Dr. Prowda stated that F.R.'s fifth grade teacher noted "obvious problems" in "most sub areas of acquiring information." (Tr. 436). Apparently, according to Dr. Prowda, F.R.'s limitations in this domain were "less than marked," notwithstanding his borderline IQ, his learning disability, and his ADHD. *Id.* The fifth grade teacher's report to which Dr. Prowda appears to be referring does note ***obvious*** problems in

16

most areas, and a "***serious problem***" only in the area of "expressing ideas in written form." (Tr. 382-89, 383). While it is true that plaintiff has had serious difficulties in his earlier years, and has been found to be significantly below average, his later evaluations show improvement. A progress report, dated January 24, 2000 states that F.R.'s sentences were becoming much longer, and he was using "more mature verb tenses." (Tr. 280).

Other reports have noted that F.R. made some improvement when placed in a small classroom setting. (Tr. 396). Another report states that F.R. was participating in a "modified" 7th grade curriculum, and that although he had "difficulties in all academic areas," he could perform simple problems and could write simple sentences. (Tr. 403). In April of 2003, F.R. had an annual review of his speech progress, and it was reported that he had made some improvement but needed to continue therapy. (Tr. 393).

Dr. Prowda noted after a review of the evidence that although F.R. did have some difficulty completing tasks and following rules, that the record did not show a "marked" impairment in the domain of attending and completing tasks. In November of 2003, Zoe Cook, one of F.R.'s teachers concluded that, although he had some "obvious" problems, F.R. ***did not have any "serious" problems*** in attending and completing tasks. (Tr. 384). Plaintiff cites that November 11, 2003 report, arguing that the fact that F.R. had "obvious" problems in many areas supports the finding of a "marked" limitation. Brief at 18. However, Dr. Prowda appears to cite the same report and finds that this report supports a finding that F.R.'s limitations in this area

are "less than marked." (Tr. 436).  Again, this court cannot substitute its own belief of what may be "marked" for the opinion of a psychiatrist who evaluated the record.

In 1999, Dr. Cox stated that F.R.'s learning disability could be related to his ADHD. (Tr. 417).  In his examination of November 17, 2003, Psychologist Donald Danser stated that F.R. had initially taken medication for ADHD when he was eight or nine years old, but his mother had stopped the medication because "she did not believe in medication treatments." (Tr. 430).  In November of 2003, F.R. had started his medication again and had been on the ADHD medication for three months. *Id.* Dr. Danser stated that F.R.'s concentration had improved, while his impulsivity was reduced. (Tr. 430).

Finally, plaintiff argues that F.R. has "marked" limitation in the domain of interacting and relating with others.  After reviewing the record, Dr. Prowda found a "less than marked" limitation in this area also, notwithstanding F.R.'s behavioral problems and his status as a Person in Need of Supervision. (Tr. 436).  The record supports a finding that F.R.'s behavioral problems have been inconsistent, and there are several references to his "pleasant personality" (Tr. 247) and his respect for authority (Tr. 258). On April 22, 2003, F.R.'s speech therapist stated that F.R. was "respectful to the other students and to myself." (Tr. 392).  Ms. Cook's November 2003 report stated that F.R. had a "slight" problem in the domain of interacting and relating with others. (Tr. 385).

Dr. Prowda is the ***only medical doctor*** who examined the evidence and related the evidence to the specific domains, utilizing the language of the regulations.  It is

not for this court to re-weigh the evidence and make a determination of whether F.R. has marked or extreme limitations. Conflicting evidence is for the ALJ to reconcile. *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998). The court also cannot make medical or psychological conclusions based upon the educational records. The court must only determine whether there is substantial evidence to support the ALJ's decision. Based on the record, I find that the ALJ's decision that F.R. did not have marked or extreme sufficient for F.R.'s impairment to be functionally equal to a listed impairment is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and that the complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: December 29, 2006

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge